# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF MICHIGAN

---

**BROADCAST MUSIC, INC.,; E.O. SMITH MUSIC; UNIVERSAL MUSIC-Z TUNES LLC d/b/a UNIVERSAL MUSIC Z SONGS; EMI BLACKWOOD MUSIC, INC.;**

     Plaintiffs,

v

**LADY GODIVA'S, INC., d/b/a LADY GODIVA'S; MARK LONDON**, individually, and **SENSATIONS, INC., d/b/a SENSATIONS**,

     Defendants.

Case No. 1:11-cv-01001-RHB

Hon. Robert Holmes Bell
Chief, U.S. District Judge

---

**PATRICK M. MCCARTHY (P49100)**
Howard & Howard Attorneys, PLLC
101 N. Main, Suite 610
Ann Arbor, MI 48104-1475
(734) 222-1097 – phone
(734) 761-5957 – fax
*Attorney for Plaintiffs*
Email – pmm@h2law.com

**ALEXANDER B. PFEIFFLE (P73858)**
Pfeiffle Law Office, P.C.
9457 Crest Circle Dr. NE
Rockford, MI 49341
(616) 633-8417 – phone
(616) 884-5147 – fax
*Attorney for Defendants*
Email – pfeifflelaw@gmail.com

---

## COUNTERCLAIM

Defendants Lady Godiva's, Inc. and Sensations, Inc., by and through their attorney,

Alexander B. Pfeiffle, of Pfeiffle Law Office, P.C., for their Counterclaim allege as follows:

## JURISDICTION AND VENUE

1. This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201 and Fed. R.

1

Civ. P. 57. This Court has subject matter jurisdiction over the claim asserted herein under 28 U.S.C. § 1331.

    2.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claim herein occurred in this judicial district.

## THE PARTIES

    3.   Plaintiff/Counter-Defendant, Broadcast Music, Inc. ("BMI") is a corporation organized and existing under the laws of the State of New York offering performance rights licenses. BMI's principal place of business is 7 World Trade Center, 250 Greenwich Street, New York, New York 10007.

    4.   Defendant Lady Godiva's, Inc. ("Lady Godiva's") is a corporation organized and existing under the laws of the State of Michigan. Lady Godiva's principal place of business is 234 Market Avenue, Grand Rapids, Michigan 49503.

    5.   Defendant Sensations, Inc. ("Sensations") is a corporation organized and existing under the laws of the State of Michigan. Sensations' principal place of business is 3525 E. Mall Drive SE, Grand Rapids, Michigan 49546. Defendant Sensations requests to be joined as a named party to this action pursuant to Fed. R. Civ. P. 19(a) and 20(a).

## GENERAL ALLEGATIONS

    6.   Prior to April 25, 2006, Defendant Sensations operated at their licensed premise, dance entertainment which presented non-obscene live nude and semi-nude dance entertainment, commonly referred to as adult entertainment.

    7.   Defendant Lady Godiva's opened for business at their licensed premise in October, 2006. At no time has Defendant Lady Godiva's presented live nude or semi-nude dance entertainment, commonly referred to as adult entertainment.

8. On April 25, 2006 the Grand Rapids City Council passed Ordinance 2006-23 (the "Ordinance"), entitled Conduct in Sexually Oriented Businesses. This Ordinance was made part of the Grand Rapids City Code at Sec. 9.140 (Attached as Exhibit A).

9. On May 8, 2006 Defendants filed a complaint challenging the constitutionality of the Ordinance. On October 23, 2006 this Court dismissed those complaints, issuing an opinion that the complaints held no merit. On October 27, 2006 Defendants filed a notice of appeal to the 6th Circuit Court of Appeals. On May 20, 2008 the 6th Circuit Court of Appeals issued its opinion denying Defendants claims and upholding the Ordinance.

10. Following the rulings of this Court and the 6th Circuit Court of Appeals and pursuant to the Ordinance, the Defendants modified their business operations to no longer offer adult entertainment.

11. Defendant Sensations has been a licensee of Plaintiff BMI, in good standing, since the early 1990's.

12. Defendant Lady Godiva's, since its incorporation, has requested from Plaintiff BMI a standard nightclub music license agreement. Plaintiff BMI has refused (and still refuses) to offer Defendant Lady Godiva's any license other than its Adult Entertainment Establishments license. At no point has Lady Godiva's been a licensee of Plaintiff BMI.

13. Defendants have always been (and still are) licensees, in good standing, with all other music license providers, including ASCAP and SESAC.

14. In a letter dated October 16, 2009 (Attached as Exhibit B), Plaintiff BMI mailed Defendants a Music Performance Agreement for Plaintiff BMI's new Adult Entertainment Establishment license.

15. In a letter dated November 30, 2009 and that same letter resent on December 23,

2009 (Attached as Exhibit C), Defendants responded to Plaintiff BMI that Defendants were no

longer adult entertainment establishments and requested that Plaintiff BMI provide its standard

nightclub contract. Plaintiff BMI refused (and still refuses) to grant any license/contract to

Defendants other than its Adult Entertainment license.

16. In a letter dated September 24, 2010 (Attached as Exhibit D), Defendants requested

Plaintiff BMI's mutual cooperation to engage in a Declaratory Judgment action in Federal Court

as a means of dispute resolution.

17. In a letter dated September 27, 2010 (Attached as Exhibit E), Plaintiff BMI informed

Defendant Sensations of its intent to cancel its music license. Plaintiff BMI again demanded that

Defendants sign its new Adult Entertainment License.

18. In a letter dated November 23, 2010 (Attached as Exhibit F), Defendant Sensations

responded to Plaintiff BMI that pursuant to this Court's order and the enacted Ordinance,

Defendants were no longer adult entertainment establishments. Further, on November 23, 2010

Defendant Sensations remitted a check, as payment for its 2011 license fees, payable to the order

of BMI, for an amount equal to its standard nightclub license fees based on Plaintiff BMI's 2010

Fee Calculation Schedule.

19. In a letter dated December 10, 2010 (Attached as Exhibit G), Plaintiff BMI again

demanded that Defendants sign an Adult Entertainment license agreement. Plaintiff BMI

refused to accept Defendant Sensation's payment for its 2011 license fees and enclosed

Defendant Sensations' check (Attached as Exhibit H). Plaintiff BMI cancelled Defendant

Sensations' license with an effective cancellation date of November 30, 2010.

20. In a letter dated January 24, 2011 (Attached as Exhibit I), Plaintiff BMI again

4

demanded that Defendants sign it Adult Entertainment license agreement stating Plaintiff BMI's

belief that Defendants fall within Plaintiff BMI's definition of an Adult Entertainment

Establishment as "an establishment that provides adult entertainment such as, but not limited to,

striptease, erotic, nude or semi-nude performances, and includes, but is not limited to, burlesque

houses, gentlemen's clubs, strip clubs, go-go bars and similar establishments".

21.  Plaintiff BMI's definition of Adult Entertainment Establishment is vague and

overbroad.  With its use of the phrase, "including, but not limited to", Plaintiff BMI could

effectively characterize, at their discretion, any and all liquor licensed establishments in the State

of Michigan as Adult Entertainment.

22.  In adherence to this Court's order and according to the terms and definitions as set

forth in the enacted city Ordinance, Defendants do not engage in "striptease, erotic, nude or

semi-nude performances".  Additionally, Defendants are not "burlesque houses, gentlemen's

clubs, strip clubs, go-go bars" or any type of "similar establishments".

23.  In a letter dated February 28, 2011 (Attached as Exhibit J), on behalf of Defendants,

Attorney Alexander B. Pfeiffle, of Pfeiffle Law Office, P.C., again informed Plaintiff BMI of the

reasons for which Defendants could not and/or would not sign its Adult Entertainment

Establishments Music Performance Agreement, and further requested Plaintiff BMI to offer a

music license that was reasonable, fair, and equitable.  No further action or correspondence had

occurred between the parties until September 20, 2011, when Plaintiffs filed their lawsuit against

Defendants alleging copyright infringement.

**CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**Determination of Reasonable License Fees for Individual Proprietors – 17 U.S.C. § 513**

24.  Defendants Lady Godiva's and Sensations repeat and reallege each of the allegations

5

contained in paragraphs 1 through 23.

25. This claim is brought pursuant to 28 U.S.C. §§ 2201 and 2202. An actual controversy presently exists between Defendants and Plaintiff BMI regarding license fees and agreements for the public performance rights of music included in Plaintiff BMI's repertoire of copyrighted musical compositions.

26. Plaintiff BMI erroneously contends that Defendants are adult entertainment establishments and therefore refuse to grant Defendants any license agreement other than its Adult Entertainment Establishments license. Plaintiff BMI's refusal to grant Defendants a reasonable license agreement effectively forces Defendants to commit copyright infringement, in that it is impractical, and nearly impossible, to know which musical compositions publicly performed by Defendants are within Plaintiff BMI's repertoire.

27. Defendants hereby request a declaration of this Court under the provisions of the Declaratory Judgment Act, 28 U.S.C. § 2201, setting forth the respective rights and other legal relations of Defendants and Plaintiff. In particular, Defendants request a declaration that determines a reasonable license fee and agreement between Defendants and Plaintiff pursuant to 17 U.S.C. § 513.

28. Because of Plaintiff BMI's refusal to grant Defendants a reasonable music license agreement, as well as Plaintiff BMI's alleged claims of copyright infringement in this lawsuit, there is a substantial controversy between the parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Accordingly, an actual controversy has arisen and exists between Defendants and Plaintiff within the meaning of 28 U.S.C. § 2201.

WHEREFORE, Defendants pray for judgment as follows:

6

(I)     Defendants request a declaration that Lady Godiva's and Sensations are not adult entertainment establishment as defined in Grand Rapids City Code at Sec. 9.140.

(II)    Defendants request a declaration that Lady Godiva's and Sensations are not adult entertainment establishments as defined by Plaintiff BMI;

(III)   Defendants request a declaration determining a reasonable license fee and agreement between Defendants and Plaintiff BMI for the public performance of copyrighted musical compositions contained within Plaintiff BMI's repertoire;

(IV)    Defendants request injunctive relief restraining Plaintiff BMI, its agents, licensees, servants, employees, successors, and assigns, and all others in concert and privity with them, from further threatening or bringing any lawsuit against Defendants for copyright infringement;

(V)     Defendants request an award of the costs, expenses, and attorney's fees incurred by Defendants herein pursuant to 17 U.S.C. § 505; and,

(VI)    Such other and further relief as the Court deems proper and just.

**LADY GODIVA'S, INC.,**
A Michigan Corporation

and

**SENSATIONS, INC.,**
A Michigan Corporation

Dated:  October 25, 2011.

By: _____
**ALEXANDER B. PFEIFFLE (P73858)**
Pfeiffle Law Office, P.C.
*Attorney for the Defendants*

*Business Address:*
    9457 Crest Circle Dr. NE
    Rockford, MI 49341
    (616) 633-8417

7

AN ORDINANCE TO AMEND TITLE IX, CHAPTER 152, ARTICLE I OF THE CODE OF THE CITY OF GRAND RAPIDS BY ADDING A NEW SECTION 9.140 TO REGULATE CONDUCT IN AND OPERATION OF SEXUALLY ORIENTED BUSINESSES.

### ORDINANCE NO. 2006 - 23

THE PEOPLE OF THE CITY OF GRAND RAPIDS DO ORDAIN:

SECTION 1. That a new Section 9.140, entitled "Conduct in Sexually Oriented Businesses" be added to Article I, Chapter 152, Title IX of the Grand Rapids City Code to read as follows:

"Sec. 9.140 Conduct in Sexually Oriented Businesses.

(1)     PURPOSE AND FINDINGS.

a.      The City hereby adopts and incorporates herein its stated findings and legislative record related to the adverse secondary effects of sexually oriented businesses, including the judicial opinions and reports related to such secondary effects, as detailed in Section 5.283 of this Code.

b.      The City Commission also relies upon findings concerning secondary effects contained in additional reports as well as in cases in accord with those cited in Sec. 5.283, including those upholding regulations of nudity and the time, place, and manner of operation of sexually oriented businesses: *Deja Vu of Cincinnati, L.L.C. v. Union Township*, 411 F.3d 777 (6th Cir. 2005); *Bronco's Entertainment, Ltd. v. Charter Township of Van Buren*, 2005 U.S. App. LEXIS 18496 (6th Cir. 2005); *Charter Township of Van Buren v. Garter Belt, Inc.*, 258 Mich. App. 594 (2003) (following *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), and *California v. LaRue*, 409 U.S. 109 (1972)); *Gammoh v. City of La Habra*, 395 F.3d 1114 (9th Cir. 2005); *SOB, Inc. v. County of Benton*, 317 F.3d 856 (8th Cir. 2003); *G.M. Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631 (7th Cir. 2003); *Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003); *In re Tennessee Public Indecency Statute*, 1999 U.S. App. LEXIS 535 (6th Cir. 1999); *Currence v. City of Cincinnati*, 2002 U.S. App. LEXIS 1258); *Jott, Inc. v. Clinton Township*, 224 Mich. App. 513 (1997); *Michigan ex rel. Wayne County Prosecutor v. Dizzy Duck*, 449 Mich. 353 (1995); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053 (9th Cir. 1986); *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248 (5th Cir. 1995); *Tily B, Inc. v. City of Newport Beach*, 69 Cal. App. 4th 1 (Cal. App. 1997); *Lady J. Lingerie, Inc. v. City of Jacksonville*, 973 F.Supp. 1428 (M.D. Fla. 1997); *City of Elko v. Abed*, 2004 Minn. App. LEXIS 360 (Minn. App. 2004); *Center for Fair Public Policy v. Maricopa County*, 336 F.3d 1153 (9th Cir. 2003); *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435 (6th Cir. 1998); *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570 (6th Cir. 2002); *DiMa Corp. v. Town of Hallie*, 185 F.3d 823 (7th Cir. 1999); *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358 (11th Cir. 1998); *Nat'l Amusements Inc. v. Town of Dedham*, 43 F.3d 731 (1st Cir. 1995); *Mitchell v. Comm'n on Adult Enter. Est. of the State of Delaware*, 10 F.3d 123 (3d Cir. 1993); *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074 (5th Cir. 1986); *Heideman v. South Salt Lake City*, 2006 U.S. App. LEXIS 2745 (10th Cir. 2006); *Fantasyland Video, Inc. v. San Diego County*, 373 F. Supp. 2d 1094 (S.D. Cal. 2005); *State ex rel. Nasal v. BJS No. 2, Inc.*, 127 Ohio Misc. 2d 101 (Ohio Ct. Comm. Pleas 2003); *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471 2002 (5th Cir. 2002); ); *Z.J. Gifts D-2, L.L.C. v. City of Aurora*, 136 F.3d 683 (10th Cir. 1998); *World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186 (9th Cir. 2004); *Andy's Restaurant & Lounge, Inc. v. City of Gary*, Case No. 2:01-CV-327 (N.D. Ind. 2005); Summaries of Key Reports Concerning the Negative Secondary Effects of Sexually Oriented Businesses; Rome, Georgia – 1996; San Diego, California - 2003; Greensboro, North Carolina – 2003; Dallas, Texas – 1997; and numerous media reports, in finding that:

(i)     Sexually oriented businesses, as a category of commercial uses, are often associated with a wide variety of adverse secondary effects including, but not limited to, personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, illicit drug use and drug trafficking, negative impacts on surrounding properties, urban blight, litter, and sexual assault and exploitation.

(ii)    Illegal and unsanitary acts involving nudity, including lewd conduct, masturbation, oral and anal sex, occur at unregulated sexually oriented businesses, including those businesses which provide private or semi-private rooms, booths, or cubicles for viewing films, videos, or live performances.

(iii)   Each of the foregoing negative secondary effects constitutes a harm which the City has a substantial government interest in preventing and/or abating. This substantial government interest in preventing secondary effects, which is the City's rationale for this ordinance, exists independent of any comparative analysis

**EXHIBIT**

**A**

between sexually oriented and non-sexually oriented businesses. Additionally, the City's interest in regulating sexually oriented businesses extends to preventing future secondary effects of either current or future sexually oriented businesses that may locate in the City. The City finds that the cases and documentation relied on in this ordinance are reasonably believed to be relevant to said secondary effects.

(2)     DEFINITIONS.

a.     The terms in this chapter shall have the meanings ascribed to them in Section 5.284 of this Code, unless otherwise indicated herein.

b.     In addition, the following terms shall have the meanings ascribed to them as follows:

(i)     "Employee" means a person who performs any service for any consideration on the premises of an sexually oriented business on a full-time, part-time, or contract basis, whether or not the person is denominated an employee, independent contractor, agent, or otherwise, and whether or not said person is paid a salary, wage, or other compensation by the operator of said sexually oriented business. Employee does not include a person exclusively on the premises for repair or maintenance of the premises or equipment on the premises or for the delivery of goods to the premises.

(ii)     "Nudity," "nude," or "state of nudity" means the knowing or intentional live display of a human genital organ or anus with less than a fully opaque covering or a female's breast with less than a fully opaque covering of the nipple and areola. Nudity, as used in this section, does not include a woman's breastfeeding of a baby whether or not the nipple or areola is exposed during or incidental to the feeding.

(iii)     "Operate or Cause to Operate" shall mean to cause to function or to put or keep in a state of doing business. "Operator" means any person on the premises of a sexually oriented business who exercises overall operational control of the business or a part of the business, who can open or close the business to the public, or who causes to function or who puts or keeps the business open or in operation. A person may be found to be operating or causing to be operated a sexually oriented business regardless of whether that person is an owner or part owner of the business.

(iv)     "Semi-nudity," "semi-nude," or in a "semi-nude condition" means the showing of the female breast below a horizontal line across the top of the areola and extending across the width of the breast at that point, or the showing of the male or female buttocks. This definition shall include the lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breasts exhibited by a bikini, dress, blouse, shirt, leotard, or similar wearing apparel provided the areola is not exposed in whole or in part.

(v)     "Sexually Oriented Business" for purposes of this chapter shall mean any adult motion picture theater, adult bookstore, adult novelty store, adult video store, adult cabaret or semi-nude model studio as defined in Section 5.284 of this Code.

(vi)     "Patron" means a customer of the sexually oriented business or a person from the general public, not an "employee" of the business, who is on the premises to obtain, receive, or view the products, services, or performances offered by the business.

(vii)     "Regularly" means recurring, attending, or functioning at fixed or uniform intervals.

(3)     UNLAWFUL ACTIVITIES.

a.     Nothing contained in this chapter is intended, or shall be construed, to permit or authorize activities which are unlawful under state law or city ordinance. It is unlawful and a violation of this chapter for an operator to knowingly or intentionally violate the provisions of this chapter or to allow, either knowingly or intentionally, an employee or a patron to violate the provisions of this chapter. It shall be a defense to prosecution that the person prosecuted was powerless to prevent the violation.

b.     No person shall knowingly or intentionally, in a sexually oriented business, appear before a patron or patrons in a state of nudity, regardless of whether such public nudity is expressive in nature.

**EXHIBIT**

**A**

Page 2 of 4

c.      No employee shall knowingly or intentionally, in a sexually oriented business, appear within view of any patron in a semi-nude condition unless the employee, while semi-nude, shall be and remain at least six (6) feet from all patrons and on a fixed stage at least eighteen (18) inches from the floor in a room of at least six hundred (600) square feet.

d.      A sexually oriented business which exhibits on the premises, through any mechanical or electronic image-producing device, a film, video cassette, digital video disk, or other video reproduction characterized by an emphasis on the display of specified sexual activities or specified anatomical areas shall comply with the following requirements: The interior of the premises shall be configured in such a manner that there is an unobstructed view from an operator's station of every area of the premises, including the interior of each viewing room but excluding restrooms, to which any patron is permitted access for any purpose. An operator's station shall not exceed thirty-two (32) square feet of floor area. If the premises has two (2) or more operator's stations designated, then the interior of the premises shall be configured in such a manner that there is an unobstructed view of each area of the premises to which any patron is permitted access for any purpose from at least one of the operator's stations. The view required in this paragraph must be by direct line of sight from the operator's station. It is the duty of the operator to ensure that at least one employee is on duty and situated in an operator's station at all times that any patron is on the portion of the premises monitored by that operator station. It shall be the duty of the operator, and it shall also be the duty of any employees present on the premises, to ensure that the view area specified in this paragraph remains unobstructed by any doors, curtains, walls, merchandise, display racks or other materials or enclosures at all times that any patron is present on the premises.

e.      Sexually oriented businesses that do not have stages or interior configurations which meet at least the minimum requirements of this section shall be given one hundred eighty (180) days from the effective date of this ordinance to comply with the stage and building requirements of this section. During said one hundred eighty (180) days, any employee who appears within view of any patron in a semi-nude condition shall nevertheless remain, while semi-nude, at least six (6) feet from all patrons.

f.      No employee who regularly appears within view of patrons in a semi-nude condition in a sexually oriented business shall knowingly or intentionally touch a patron or the clothing of a patron in a sexually oriented business.

g.      No operator shall allow or permit a sexually oriented business to be or remain open between the hours of two o'clock (2:00) A.M. and seven o'clock (7:00) A.M. on any day.

(4)      SCIENTER REQUIRED TO PROVE VIOLATION OR BUSINESS LIABILITY.

This ordinance does not impose strict liability. Unless a culpable mental state is otherwise specified herein, a showing of a knowing or reckless mental state is necessary to establish a violation of a provision of this ordinance. Notwithstanding anything to the contrary, for the purposes of this ordinance, an act by an employee shall be imputed to the sexually oriented business for purposes of finding a violation of this ordinance only if an officer, director, or general partner, or a person who managed, supervised, or controlled the operation of the business premises, knowingly or recklessly allowed such act to occur on the premises. It shall be a defense to liability that the person to whom liability is imputed was powerless to prevent the act.

(5)      PENALTY; EQUITABLE REMEDIES.

a.      Any person, business, or entity violating or refusing to comply with any provisions of this chapter shall, upon conviction, be deemed guilty of a misdemeanor and shall be punished by imposition of a fine not to exceed five hundred dollars ($500.00) or by imprisonment for a period not to exceed ninety (90) days, or both. Each day that a violation is permitted to exist or occur, and each separate occurrence, shall constitute a separate offense. Further, any premises, building, dwelling, or other structure in which a sexually oriented business, as defined in Section 5.284 of this Code, is repeatedly operated or maintained in violation of the provisions of this chapter shall constitute a public nuisance and shall be subject to civil abatement proceedings initiated by the City of Grand Rapids in a court of competent jurisdiction. Each day that a violation is permitted to exist or occur shall constitute a separate operation or maintenance of the violation.

b.      Notwithstanding subsection (1) hereof, the City may employ any remedy available at law or in equity to prevent or remedy a violation of any provision of this chapter.

**EXHIBIT**

**A**

Page 3 of 4

(6)     SEVERABILITY.

This ordinance and each section and provision of said chapter hereunder, are hereby declared to be independent divisions and subdivisions and, not withstanding any other evidence of legislative intent, it is hereby declared to be the controlling legislative intent that if any provisions of said chapter, or the application thereof to any person or circumstance is held to be invalid, the remaining sections or provisions and the application of such sections and provisions to any person or circumstances other than those to which it is held invalid, shall not be affected thereby, and it is hereby declared that such sections and provisions would have been passed independently of such section or provision so known to be invalid."

Carried by a roll call vote:        `     Yeas:  -6  Coms. Bliss, Jendrasiak, Lumpkins, Schmidt, White, Mayor Heartwell        Nays:  -1  Com. Tormala

I hereby certify that the foregoing is a true transcript of the action of the City Commission of the City of Grand Rapids, Michigan, in public session held April 25, 2006.

Mary Therese Hegarty, City Clerk

**EXHIBIT**

**A**

Page 4 of 4



**EXHIBIT**

**B**

Page 1 of 6

**www.bmi.com/adult**
**Username: 1860457**
**Password: 639499**

October 16, 2009

Mark London
Lady Godiva's
234 Market Ave SW
Grand Rapids MI 49503

**Visit Us On The Web About Your Licensing Needs: www.bmi.com/adult**
**Call BMI: (888) 689-5264**
**Email: glentgroup@bmi.com**

Dear Mr. London:

## Do You Have "The Right" To Play Music?

When you see the words "All Rights Reserved" on a home video that you've rented or purchased, you know that playing that video before a public audience is prohibited.

What you may *not* know is that the same restrictions apply to music you may purchase, or live musicians you may hire to play in a public setting. The "*Performing Right*", or right to perform music publicly, is reserved for the copyright owners of the music you are performing. The U.S. copyright law, which has recognized this "*Performing Right*" of songwriters, composers, and publishers since 1897, is similar to other copyright and patent protection. It was designed to *enable and encourage* songwriters and composers to continue to create as they are compensated for the public performances of their music by businesses and other organizations.

## How Can BMI Help?

BMI is a non-profit-making performing right organization that has been in operation for 70 years. Our purpose is to provide licensing to businesses and other entities that publicly perform music so that BMI music users do not need to obtain permission from each copyright owner individually. By providing Music Performance Agreements, BMI in turn protects the interests of the more than 400,000 songwriters, composers, and music publishers affiliated with BMI. BMI's award-winning repertoire currently contains more than 6.5 million musical works and accounts for roughly half of all of the music performed in America every day. Permission to publicly perform all BMI music is granted under a BMI Music Performance Agreement, which can be obtained by licensing online or completing and returning the enclosed agreement.

**To license online, go to the web address located in the upper right hand corner of this letter, click "Apply for a License" then enter your Username & Password.** Many trade associations have discount programs with BMI. Contact your association to see if you qualify for a discount!

If you have any questions, please call or e-mail BMI as noted above. Thank you.

Sincerely,

*Michele A. Reynolds*

**Michele A. Reynolds**
**Assistant Vice President**

Encl: ACL1 MPA, Q&A, Related Info, BRE
/1860457/jtj/Premise State: MI

 10 Music Square East, Nashville, Tennessee 37203-4399     (888) 689-5264     Fax: (615) 401-2624     ECINTRO-2.doc
BMI and the music stand symbol are registered trademarks of Broadcast Music, Inc.


Under an Act of the State of Michigan relating to performing rights societies, Broadcast Music, Inc. (BMI) is recognized as a performing rights society that licenses the public performance of nondramatic musical works on behalf of copyright owners pursuant to the United States Copyright Law.

As the proprietor of a business in the State of Michigan where music is publicly performed, you are required to obtain authorization from the copyright owners of that music in order for your performances to be legal. BMI represents more than 400,000 songwriters, composers, and music publishers ("affiliates") and more than 6.5 million musical works. For a single annual fee, a BMI Music Performance Agreement will authorize you to legally perform at your place of business all of the musical works in the BMI repertoire created and owned by our affiliates, and you will avoid the necessity of having to contact each one individually to obtain permission.

In connection with our offering you a Music Performance Agreement, please be advised of the following:

### THE BMI MUSIC PERFORMANCE AGREEMENT

- The BMI Music Performance Agreement is the contract that describes the rates and terms of royalties required to be paid by you to BMI for authorization to perform the music which we license.
- The schedule of rates can be found within the Music Performance Agreement under the heading License Fee Schedule.
- The Music Performance Agreement, including the schedule of rates and terms of royalties, which BMI has offered you is the same agreement BMI offers throughout the United States for your class and category of music use. This constitutes BMI's notice to you under Public Act 430, Section 4 regarding the rates and terms offered to comparable businesses in your county. Please read the license Agreement carefully and call us at the tollfree number which appears on the enclosed letter if you have any questions. BMI complies with federal law and orders of courts having appropriate jurisdiction regarding the rates and terms of royalties and the circumstances under which licenses for rights of public performance are offered to any proprietor.

### SECTION 3 OF THE MICHIGAN STATUTE

Section 3 of Michigan Public Law 430 states:

**(1)** A performing rights society doing business in this state shall maintain an electronic computer database of its repertoire. The performing rights society shall make available, in electronic form, a current list of at least the names of the authors and publishers of all its copyrighted musical works and the titles of the copyrighted musical works in its repertoire. The performing rights society shall update the list at least monthly.

**(2)** Upon request, any person may review the list of copyrighted works and a list of members and affiliates.

**(3)** The list established under subsection (1) that is in electronic form at the time a proprietor enters into a contract with a performing rights society and as supplemented by subsequent additions and deletions to that list is binding between the parties for the period of the contract.

**(4)** A performing rights society shall provide a copy of its most current lists of copyrighted musical works and members at cost to any person upon request. As used in this subsection, "cost" does not include the cost of maintaining the database or any other overhead.

**(5)** A performance rights society licensing nondramatic performance of musical works in this state shall establish and maintain a toll-free telephone number that can be used to answer inquiries regarding specific musical works licensed by that performing rights society and the copyright owners represented by that performing rights society.

### ACCESS TO AFFILIATE AND REPERTOIRE LIST

Using a PC and a modem, you can electronically access the most current list of the affiliates we represent and the works in our repertoire that are licensed under your Music Performance Agreement. You should log onto the Internet and access the Repertoire section of the bmi.com domain on the World Wide Web. Our URL address is http://www.bmi.com. Access to the Internet can be obtained through many commercial on-line services, as well as from specialized Internet access providers, often for the cost of a local telephone call. If you have questions about any song title or affiliate listing that you locate on our Internet domain, please call **1-800-800-9313** for assistance.

In addition to on-line access, a list of works in the BMI repertoire as of the last printing also is available in book form or on CD-ROM. To obtain a copy in either of those forms, please remit your check or money order in the indicated amount payable to BMI at the address below, with a letter specifying which you desire. The cost is as follows (prices include shipping and handling):

    (a) Printed list, approximately 17-20 vols., $1,200

    (b) CD-ROM version, 1 disk, $25

If you do not have the equipment to electronically access BMI's affiliate list, we will give you the opportunity to review the most currently available printed list of our affiliates. A refundable security deposit of $10 is required for the book. Please send your check or money order for $10 to the address below, with a letter indicating that you would like the affiliate book sent to you for review. We will not deposit your check unless you fail to return the book to us within 10 business days. Upon BMI's receipt of the book, your check or money order will be returned.

For the most current information about any affiliate or work listed in print or on CD-ROM, you should access our Internet domain or call **1-800-800-9313**.

### EXEMPTIONS UNDER THE FEDERAL COPYRIGHT LAW

The United States copyright law (17 U.S.C.A. §§101 et seq.) contains certain provisions that may exempt you from copyright liability. You may review the copyright law and consult with an attorney, if necessary, to determine if you qualify for such an exemption.

### YOUR RIGHT TO THE INFORMATION PROVIDED IN THIS NOTICE

Please be advised that you are entitled to receive all information required under the Michigan Music Royalty Practices Act, and the failure by BMI to provide that information is a violation of this statute.

| Michigan<br>LL-07/09-28 | **EXHIBIT**<br><br>**B**<br><br>Page 2 of 6 | **BROADCAST MUSIC, INC.**<br>**Attn.: Marketing/Fulfillment**<br>**10 Music Square East**<br>**Nashville, Tennessee 37203** | BMI and the music stand symbol are registered trademarks of Broadcast Music, Inc.  |

**EXHIBIT**

**B**



## Adult Entertainment Establishments

Page 3 of 6

ACL1

_9/09-ACL1

BMI® Music Performance Agreement

### 1. DEFINITIONS

(a) **LICENSEE** shall mean the entity identified on Page 4 herein that owns and/or operates the Licensed Premises.

(b) **Licensed Premises** shall mean the Adult Entertainment Establishment which is owned or operated by LICENSEE and which is identified on Page 4 herein, or, in the event of multiple locations, the Adult Entertainment Establishments identified on Schedule A which shall be attached hereto by LICENSEE.

(c) **Adult Entertainment Establishment** shall mean an establishment that provides adult entertainment such as, but not limited to, striptease, erotic, nude or semi-nude performances, and includes, but is not limited to, burlesque houses, gentlemen's clubs, strip clubs, go-go bars and similar establishments.

(d) **Jukebox** is a machine or device that (i) is employed solely for the performance of non-dramatic musical works by means of records, compact discs, mp3 files or other digital audio or video means upon being activated by insertion of coins, currency, tokens, or other monetary units or their equivalent; (ii) is located in an establishment making no direct or indirect charge for admission at the time of performance; (iii) is accompanied by a list which is comprised of the titles of all of the musical works available for performance on it, and is affixed to or otherwise appears on the phonorecord player, or is posted in the establishment in a prominent position where it can be readily examined by the public at the time of performance; and (iv) affords a choice of works available for performance and permits the choice to be made by the patrons of the establishment in which it is located at the time of performance (as distinguished from the establishment's employees or performers).

(e) **Outside Ticket Services** shall mean third-party services, such as, but not limited to, Ticketmaster, Ticketweb and Ticketron which distribute tickets to the public for events at the Licensed Premises.

(f) **Occupancy** shall mean the total maximum allowable occupancy loads/capacities for the entire premises of the Licensed Premises calculated under adopted building/fire codes, which shall not be limited to the number of available seats. If no such regulations are in effect in the applicable jurisdiction, then maximum occupancy shall be calculated as one (1) person for every twenty (20) square feet of the total Licensed Premises.

### 2. BMI GRANT

(a) BMI hereby grants to LICENSEE a non-exclusive license to perform, present, or cause the public performance at the Licensed Premises of all musical works of which BMI shall have the right to grant public performance licenses during the Term. This license does not include: (i) dramatic rights, the right to perform dramatico-musical works in whole or in substantial part, the right to present individual works in a dramatic setting or the right to use the music licensed hereunder in any other context which may constitute an exercise of the "grand rights" therein; or (ii) the right to broadcast, cablecast, telecast or otherwise transmit (including by the Internet or on-line service) the performances licensed hereunder to persons outside of Licensed Premises, other than by means of a music-on-hold telephone system operated by LICENSEE at the Licensed Premises.

(b) This license does not authorize live concert performances at the Licensed Premises when tickets for such live concert performances can be purchased from or through Outside Ticket Services.

(c) This license does not authorize performances occurring outside the Licensed Premises, including, but not limited to, conventions, trade shows and third-party events.

(d) This license does not authorize performances at the Licensed Premises by means of a Jukebox that is licensed by the Jukebox License Office ("JLO") or via another BMI license. For the avoidance of doubt, neither the JLO license nor such other BMI license would authorize performances by means of a Jukebox that is activated by dancers or by LICENSEE's employees. In the event of Jukebox activation by LICENSEE's dancers or employees, this Adult Entertainment Establishment license would be necessary to authorize such performances.

(e) BMI reserves the right at its discretion to withdraw from the license granted hereunder any musical work as to which any legal action has been instituted or a claim made that BMI does not have the right to license the performing rights in such work or that such work infringes another composition.

### 3. LATE PAYMENT CHARGE

BMI may impose a late payment charge of one and one-half percent (1½%) per month or the maximum rate permitted by law, whichever is less, from the date any payment is due hereunder on any payment that is received by BMI more than one (1) month after the due date. BMI shall impose a $25.00 service charge for each unpaid check, draft or other means of payment LICENSEE submits to BMI.

### 4. INDEMNITY BY BMI

BMI agrees to indemnify, save harmless and defend LICENSEE, its officers and employees, from and against any and all claims, demands or suits that may be made or brought against them or any of them with respect to the performance of any musical works licensed under this Agreement. Such indemnity shall be limited to musical works which are licensed by BMI at the time of LICENSEE's performances. BMI will, upon reasonable written request, advise LICENSEE whether particular musical works are available for performance as part of BMI's repertoire. LICENSEE shall provide the title and the writer/composer of each musical composition

requested to be identified. LICENSEE agrees to give BMI immediate notice of any such claim, demand or suit, to deliver to BMI any papers pertaining thereto, and to cooperate with BMI with respect thereto, and BMI shall have full charge of the defense of any such claim, demand or suit.

## 5.  BREACH OR DEFAULT/WAIVER

Upon any breach or default of the terms and conditions of this Agreement, BMI shall have the right to cancel this Agreement, but any such cancellation shall only become effective if such breach or default continues for thirty (30) days after the date of BMI's written notice to LICENSEE thereof. The right to cancel shall be in addition to any and all other remedies which BMI may have.  No waiver by BMI of full performance of this Agreement by LICENSEE in any one or more instances shall be a waiver of the right to require full and complete performance of this Agreement thereafter or of the right to cancel this Agreement in accordance with the terms of this Paragraph.

## 6.  ARBITRATION

All disputes of any kind, nature or description arising in connection with the terms and conditions of this Agreement shall be submitted to the American Arbitration Association in the City, County and State of New York for arbitration under its then prevailing arbitration rules. The arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator.  If two arbitrators are so appointed, they shall appoint a third arbitrator.  If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator.  The award made in the arbitration shall be binding and conclusive on the parties and judgment may be, but need not be, entered in any court having jurisdiction. Such award shall include the fixing of the costs, expenses and attorneys' fees of arbitration, which shall be borne by the unsuccessful party.

## 7.  FEES

(a)  In consideration of the license granted herein, LICENSEE agrees to pay BMI an Annual License Fee which is based on the Occupancy of Licensed Premises and is calculated as set forth in the License Fee Schedule below.  In the event, that LICENSEE operates multiple Licensed Premises, LICENSEE shall submit to BMI annually a Schedule A, as described in Paragraph 1(b) which lists the address of each Licensed Premises and the Occupancy of each.

| LICENSE FEE SCHEDULE | |
|---|---|
| **Fee Per Occupant** | **Minimum Annual License Fee** |
| **$10.95** | **$850** |

$$\underbrace{0}_{\substack{\text{Occupancy}\\ \text{(as defined in Paragraph 1[f])}}} \quad X \quad \$10.95 \quad = \quad \underbrace{\phantom{xxxxx}}_{\substack{\text{Total Annual Fee}\\ \text{(If less that $850, enter $850)}}}$$

**If Occupancy cannot be established by local building/fire codes, use formula below:**

$$\underbrace{\phantom{xxxxx}}_{\substack{\text{Total Square Footage}\\ \text{(entire Licensed Premises)}}} \quad \div \quad 20 \quad = \quad \underbrace{\phantom{xxxxx}}_{\substack{\text{Occupancy}\\ \text{(as defined in Paragraph 1[f])}}}$$

**EXHIBIT**

**B**

Page 4 of 6

(b)  LICENSEE shall pay the Annual License Fee for the initial Contract Year upon execution of this Agreement.  The license fee payment for subsequent Contract Years shall be due no later than thirty (30) days after the anniversary date of this Agreement.

(c)  If LICENSEE does not otherwise owe BMI any fees under this or any other BMI agreement, LICENSEE shall receive a 5% discount for any Contract Year in which LICENSEE's Annual License Fee is paid in full and in a timely manner in accordance with subparagraph (b) above (the "Timely Pay Discount").  LICENSEE shall receive an additional 5% discount for the initial Contract Year if LICENSEE completes the licensing process online and pays the Annual License Fee online at www.bmi.com (the "Online Payment Discount"). The 5% Online Payment Discount shall continue for each subsequent Contract Year for which LICENSEE pays its Annual License Fee online.

(d)  For each subsequent Contract Year, the Fee Per Occupant and the Minimum Annual License Fee shall be an adjustment of the previous Contract Year rates based upon any percentage increase in the Consumer Price Index – All Urban Consumers (CPI-U) between the preceding February and the next preceding February. The Fee Per Occupant shall be rounded to the nearest five cents, and the Minimum Annual License Fee shall be rounded to the nearest dollar. BMI will advise LICENSEE in writing of the adjusted Per Occupant Fee and Minimum Annual License Fee as part of its annual billing process.

(e)  In no event shall the Licensed Premise's Annual License Fee for any Contract Year be less than the Minimum Annual License Fee for that Contract Year. The Minimum Annual License Fee for the 2009 Contract Year is $850 and shall be adjusted in subsequent Contract Years by the CPI-U, as explained in subsection (d) above.

(f)  Occupancy is subject to adjustment prospectively under this Agreement by either LICENSEE or BMI.  LICENSEE may notify BMI of a change in Occupancy at any time during the Term by calling a Customer Relations Executive at 1-800-925-8451 to notify BMI of a change in Occupancy, and the change will be reflected in LICENSEE's next billing by BMI; however, doing so will not preserve LICENSEE's right to dispute BMI billings unless LICENSEE sends BMI timely notice of an Occupancy change in writing along with

appropriate documentation issued by local building/fire authority substantiating such change. Billings adjusted by BMI hereunder will include a *pro rata* credit for any unearned license fees paid in advance. LICENSEE also agrees that any changes made to Occupancy hereunder shall constitute a true and accurate representation prospectively from the date of the change. Any changes in Occupancy are subject to verification by any and all reasonable means which may include, but shall not be limited to, independent contacts by BMI representatives with LICENSEE's business establishment, use of public records, advertisements and third party observations. From time to time BMI may review Occupancy. If BMI thereafter believes that LICENSEE is not paying proper license fees because the Occupancy would result in higher license fees, BMI will notify LICENSEE by mail. If LICENSEE agrees to BMI's assessment of Occupancy, the change will be reflected in the next billing. If LICENSEE disputes BMI's revised Occupancy, LICENSEE must notify BMI within thirty (30) days of the notification by BMI. If within ninety (90) days of such notification by BMI, LICENSEE does not respond or LICENSEE and BMI cannot agree upon an appropriate Occupancy, either party may commence an arbitration proceeding pursuant to Paragraph 6 to resolve the dispute over the amount of license fees. Such right shall be in addition to any and all other remedies BMI may have under the Agreement, including the right to cancel this Agreement.

## 8. SALE OF LICENSED PREMISES OR CLOSING OF BUSINESS

In the event that LICENSEE sells the Licensed Premises or closes the business during the Term of this Agreement, and LICENSEE sends BMI written notice by certified mail, by generally recognized same-day or overnight delivery service with receipt signature required, or via email to glentgroup@bmi.com within thirty (30) days of the sale or closing, BMI will adjust LICENSEE's fees *pro rata* from the date of sale or closing, and will refund to LICENSEE any unearned licensed fees paid hereunder. Any *pro rata* credit adjustment made hereunder shall not reduce LICENSEE's Annual License Fee below the Minimum Annual License Fee applicable under the Agreement.

## 9. OFFER OF COMPARABLE AGREEMENT

In the event that BMI, at any time during the Term of this Agreement, shall, for the same class and category as that of LICENSEE, issue licenses granting rights similar to those in this Agreement on a more favorable basis, BMI shall, for the balance of the Term, offer LICENSEE a comparable agreement.

## 10. CANCELLATION OF ENTIRE CATEGORY

BMI shall have the right to cancel this Agreement along with the simultaneous cancellation of the agreements of all other licensees of the same class and category as LICENSEE, as of the end of any month during the Term, upon sixty (60) days advance written notice.

## 11. STATE OR LOCAL TAX

In the event that the payment of any license fee to BMI by LICENSEE pursuant to this Agreement causes BMI to become liable to pay any state or local tax which is based upon the license fees received by BMI from LICENSEE, LICENSEE agrees to pay to BMI the full amount of such tax together with license fee payment(s) as invoiced by BMI; provided, however, that BMI shall make reasonable efforts to be exempted or excused from paying such tax, and BMI is permitted by law to pass through such tax to LICENSEE.

## 12. OKLAHOMA RATE CHANGE NOTICE

BMI shall notify LICENSEE of any rate change thirty (30) days prior to the expiration date of this Agreement.

## 13. COLORADO 72 HOUR REVIEW

LICENSEE shall have the right to rescind the Agreement for a period of seventy-two (72) hours after the execution of the Agreement.

## 14. CUSTOMER OUTREACH

LICENSEE agrees to accept from time to time pre-recorded telephone messages from BMI that may contain information regarding your account.

## 15. NOTICES

Unless otherwise stated herein, all notices, if any, under this Agreement will be in writing and deemed given upon "mailing," when sent by ordinary first-class U.S. mail to the party intended, at its mailing address herein stated, or any other address which either party may designate. Any such notices sent to BMI shall be to the attention of the Vice President, Licensing Department at 10 Music Square East, Nashville, TN 37203. Any notice sent to LICENSEE shall be to the attention of the person signing this Agreement on behalf of LICENSEE or such other person as LICENSEE may designate to BMI in writing.

## 16. MISCELLANEOUS

This Agreement constitutes the entire understanding between the parties, will not be binding until signed by both parties, and cannot be waived or added to or modified orally, and no waiver, addition or modification shall be valid unless in writing and signed by the parties. The rights of LICENSEE are not assignable. This Agreement, its validity, construction and effect, shall be governed by the laws of the State of New York. The fact that any provisions contained herein are found by a court of competent jurisdiction to be void or unenforceable shall not affect the validity or enforceability of any other provisions. All headings in this Agreement are for the purpose of convenience and shall not be considered to be part of this Agreement.

**EXHIBIT**

**B**

**17. TERM OF AGREEMENT**
The initial Term of this Agreement shall begin on the first day of (month/year) _____ October, 2009 _____ and end on the last day of (month/year) _____ September, 2010 _____ and shall continue thereafter for additional Terms of one (1) year each unless cancelled by either party as of the end of the initial Term or any subsequent one (1) year Term (herein sometimes referred to as a "Contract Year") upon thirty (30) days advance written notice to the other party.

## AGREEMENT

THIS AGREEMENT made and entered into on (Date will be entered by BMI upon execution)_____
between BROADCAST MUSIC, INC., a corporation with principal offices at 320 West 57th Street, New York, N.Y. 10019, herein referred to as BMI, and **the entity described below and herein referred to as LICENSEE.**

| **LEGAL NAME** | **LICENSED PREMISES** |
|---|---|
| Lady Godiva's, Inc. | 234 Market Ave SW |
| (Name of Corporation, Partnership, or Individual Owner) | (Street Address) |
| **TRADE NAME** | Grand Rapids      MI      49503 |
|  | (City)      (State)      (Zip) |
| Lady Godiva's | (616) 458-0300 |
| (Doing business under the name of) | (Telephone Number)      (Fax Number) |
|  | Mark London      Owner |
| **PLEASE CHECK APPROPRIATE BOX** | (Contact Name)      (Title) |
|  |      myspace.com/ladygodivasgr |
| ☐ Individual Ownership | (Email Address)      (Web Address) |
| ☐ LLC ☑ Corporation    MI | |
|      (State of Incorporation, if different from Licensed Premises) | **MAILING ADDESS** |
| ☐ LLP ☐ Partnership | (if different from Licensed Premises) |
|      (Enter names of partners) | |
| ☐ Other | |
|  | (Street Address) |
| Federal Tax ID No. _____ | (City)      (State)      (Zip) |
| **GOVERNMENT ENTITIES** | |
| (if applicable, please check one) | (Telephone Number)      (Fax Number) |
| ☐ Federal ☐ State _____ | |
|      (State) | (Contact Name)      (Title) |
| ☐ Local | |
|      (Municipality and State) | (Email Address- if different from above) |

| **TO BE COMPLETED BY LICENSEE** | **FOR ADMINISTRATIVE USE ONLY** |
|---|---|
| By signing this Agreement you represent that you have the authority to bind LICENSEE and that you have read, understood and agree to all of the terms and conditions herein. *(SIGN HERE – PLEASE INCLUDE PAYMENT)* | **TO BE COMPLETED BY BMI**<br>**BROADCAST MUSIC INC.** |
| _____<br>Signature | |
| _____<br>Print Name / Title | |
| Signatory Email Address*<br>(if different from above) | |

| **FOR BMI USE ONLY** | | **ACL1** |
|---|---|---|
| | 1860457 | |
| **ACCOUNT NO.** | **COID** | |

*In order to receive a copy of your executed Agreement, please provide the email address of the Signatory

**PLEASE RETURN THIS ENTIRE SIGNED LICENSE AGREEMENT TO:**
**BMI, 10 MUSIC SQUARE E., NASHVILLE, TN 37203**

® BMI and the music stand symbol are registered trademarks of Broadcast Music, Inc.

**EXHIBIT**

**B**

# C

**Page 1 of 1**

234 Market Ave. SW
Grand Rapids, MI 49503

November 30, 2009

Michele A. Reynolds
BMI
10 Music Square East
Nashville, TN 37203

*RESENT 12/23/09*
*CERTIFIED U.S. MAIL*
*RESTRICTED DELIVERY*

Dear Ms. Reynolds:

Thank you for your letter of October 16, 2009. I am a resident of Florida and I have not been in Michigan for over a month. My apologies to you for not responding sooner.

With your letter you included a Music Performance Agreement for Adult Entertainment Establishments. We look forward to an Agreement with your agency but we are not now, nor have we ever been considered Adult Entertainment. There is an adult retail store in the same building in which our nightclub is located but that is a separate business and not affiliated with our nightclub.

Our nightclub is adult in the fact that we serve alcoholic beverages but that makes us no more adult than any other nightclub in Grand Rapids or Michigan. If you could please send us your standard nightclub contract we will return it at our earliest convenience.

Sincerely,

Mark London
President
Lady Godiva's, Inc.

# EXHIBIT
# D
### Page 1 of 1

234 Market Ave. SW
Grand Rapids, MI 49503

September 24, 2010

**VIA CERTIFIED UNITED STATES MAIL**

Mark Glessner
Director, General Licensing, BMI
10 Music Square East
Nashville, TN 37203-4399

Dear Mr. Glessner:

I am in receipt of your September 15, 2010 letter. We appear to be at an impasse. Despite the fact that we have requested, on several occasions, a nightclub license with your organization, you have refused to provide this as a way of ending this dispute. You are correct in your assertion that I will not sign an Adult Entertainment License. That is because we are not an adult entertainment establishment. Your threats, intimidation, and lies about our business will not force us to enter an agreement that is false on its face. We are once again requesting that you provide us with a standard nightclub license, which we will gladly sign and return with the license fees.

In the event that you do not come to your senses and provide us with this license we would suggest the following as a way to cooperatively end this dispute. Although your organization appears to operate more like a collection agency than a licensing agency, we would request that in the present situation you operate as though you really are a licensing agency. In this regard, we as a licensee would request that you as a licensor would enter into a partnership where we could go to Federal Court in a cooperative endeavor to seek a Declaratory Judgment to resolve our dispute. A Declaratory Judgment is allowed under federal statute (Declaratory Judgment Act of 1934, 28 U.S.C.A. 2201) and gives a declaration of rights where there is an actual controversy between the parties. This is certainly the situation with the case at hand.

I hope this will give us some direction in resolving our dispute. Continued threats and intimidation emanating from your organization will not bring resolution.

Sincerely,

Mark London
President
Lady Godiva's, Inc.



**Music That Works For You**

EXHIBIT

**E**

Page 1 of 1

www.bmi.com/adult
**Username: 3026048**
**Password: 934292**
**Cancellation Date:**
**November 30, 2010**

September 27, 2010

Mark London
Sensations
3525 E Mall Dr SE
Grand Rapids MI  49546

FEDEX

## Save Up To 20%! Just Renew Your License Before Your Cancellation Date & Pay Your Fee Online Within 90 Days

Dear Mr. London:

Thank you for playing BMI music.  We are proud to be able to tell you that the BMI repertoire has continued to dominate our industry in awards won, making your license to play BMI music an even better asset to your business.  BMI has also extended its service and we are pleased to announce the development of our new online music licensing service, which allows you to manage your BMI account, pay your fees, and…renew your license online.

Pursuant to the terms of your current BMI agreement, BMI is cancelling your agreement as of **November 30, 2010** .  BMI's new License, which was developed specifically for the way Adult Entertainment Establishments use music, can be completed online and will replace your current agreement as of **December 1, 2010** . If you renew your license early, you can save 10% off your licensing fee.  If you pay your fee online within 30 days of your cancellation date, you can save an additional 10%.

**To renew your license online, please go to the web address located in the upper right hand corner of this letter, click "Renew Your License" and enter your Username and Password.**

I have also enclosed a copy of the new BMI License for Adult Entertainment Establishments for your convenience.  If you have any questions, please call BMI at (800) 925-8451 or Email us at: glentgroup@bmi.com.  We look forward to continuing to provide you with quality service and great music.

Sincerely,

Jack Flynn
Executive Director
Licensing Key Accounts

Encl:  ACL1 MPA, Renewal One Sheet, BRE
Account #3026048//Premise State:  MI

P.S. BMI customers can now save up to 25% at FedEx, JBL, and Dell as part of our Platinum Privileges Program.  Just go to www.bmi.com/fedex, www.bmi.com/jbl and www.bmi.com/dell and start saving now!

**EXHIBIT**

**F**

**Page 1 of 1**

3525 E. Mall Dr. S.E.
Grand Rapids, MI 49546

November 23, 2010

Jack Flynn
Executive Director
Licensing Key Accounts
BMI
10 Music Square East
Nashville, TN 37203-4399

Dear Mr. Flynn:

Please be advised that we are in receipt of your September 27, 2010 letter cancelling our music license. You claim this change is due to your new Adult Entertainment License, which you have requested we sign and accept as our new license. The only problem is we are no longer in the adult entertainment business.

In January 2007 we notified you that the City of Grand Rapids had passed an Ordinance to put adult entertainment establishments like ours out of business. We requested your assistance and you gave us none. In October 2008 we again requested your assistance and were again rebuffed. As a result of the Grand Rapids' Ordinance (and our failure to overturn this Ordinance in the Federal Courts) we made a conscious decision to no longer offer adult entertainment. We are no longer considered "adult entertainment" by the City of Grand Rapids, the State of Michigan, or even ASCAP, your sister licensing organization. We will not be signing an Adult Entertainment License with your organization.

As part of our change over to non-adult entertainment we have through renovations reduced our occupancy capacity to 95 persons. As a show of good faith (and an opportunity to save 10%) we have enclosed our estimated payment for a continuation of our Nightclub Music License. In the event that you decide not to continue our present license, we would request that you return this payment.

We have based our payment on your 2010 Fee Calculation schedule. Ninety-five occupancy X Total Rate Per Year Per Occupant ($6.05) = $574.75 Less 10% = $517.28.

Sincerely,

Mark London
President
Sensations, Inc.

Enclosure

**EXHIBIT**

# G

### Page 1 of 2



**Mark Glessner**
Director
General Licensing

December 10, 2010

**VIA FED EX**

Mr. Mark London
Sensations
Sensations, Inc.
3525 East Mall Dr
Grand Rapids, MI 49546

**RE: Sensations and BMI Adult Entertainment Establishments Music License**

Dear Mr. London,

I am in receipt of your letter dated November 23, 2010 addressed to Jack Flynn. Mr. Flynn has forwarded this matter to me in that your reasoning for not signing the Adult Entertainment Establishments Music License is the same reasoning offered with regard to your other establishment, Lady Godiva's. Accordingly our response will be similar.

BMI cannot offer your establishment the Eating and Drinking Establishments Music License when it is obvious and apparent that your business falls squarely under the definition of an Adult Entertainment Establishment. BMI is obligated to offer the same music license to all business establishments in the same class and category, and each business is classified according to the specific characteristics within the establishment. The Adult Entertainment Establishments license defines an Adult Entertainment Establishment as "an establishment that provides adult entertainment such as, but not limited to, striptease, erotic, nude or semi nude performances, and includes, but is not limited to, burlesque houses, gentlemen's clubs, strip clubs, go-go bars and similar establishments."

Sensations, Inc. a/k/a/ Sensations clearly fits within the classification of the above mentioned definition. Lap dances, shower dances, VIP dances, and entertainers dancing on a main stage are all obvious characteristics of an Adult Entertainment Establishment. As mentioned in my letter dated December 6, 2010 to Lady Godiva's, we are aware of the ordinances passed by the city of Grand Rapids regarding the regulations of adult clubs and the subsequent lawsuits pertaining thereto. The fact that entertainers are no longer allowed to be nude in businesses per city ordinance does not take Sensations and similar establishments outside the scope of the Adult Entertainment Establishments Music license.

As a reminder, until such time as you execute the BMI Adult Entertainment Establishments Music License, your establishment is not authorized by BMI to publicly perform any of the over 6.5 million works in the BMI repertoire. The unauthorized public performance of copyrighted works constitutes copyright infringement in violation of United States Copyright Law and may subject the infringer to substantial monetary damages.

# G

Mr. Mark London
December 8, 2010
Page 2

**Page 2 of 2**

I have enclosed your voided check number #1636 dated November 23, 2010 in the amount of $517.28.  As you know your BMI Eating and Drinking Establishments license was cancelled effective November 30, 2010. Should you desire permission to publicly perform BMI-affiliated music at Sensations, I encourage you to sign and return the enclosed Adult Entertainment Establishments License along with the appropriate payment as shown.

Respectfully,

Encl: ACL MPA, BRE, Check #1636
MG/mw 3026048// Premise State: MI

1636

**SENSATIONS, INC.**
3525 EAST MALL DR
GRAND RAPIDS, MI 49546

74-8067-2724

DATE 11-23-10

PAY TO THE
ORDER OF BMI                                      $ 517.28

Five Hundred Seventeen and —28/100 DOLLARS

Lake Michigan Credit Union
GRAND RAPIDS, MI 49501

Acct # 3026048

FOR 2011 Music License              Mark Landa

⑆272480678⑆ 1020093615731⑆ 1636

**EXHIBIT**

# H

**Page 1 of 1**



# EXHIBIT

# I

## Page 1 of 2

**Jeffrey J. Burrow**
Director
Legal & Business Affairs
General Licensing

January 24, 2011

**Via Federal Express**
Mark London
President
Lady Godiva's, Inc.
234 Market Ave. SW
Grand Rapids, MI 49503

Re:    **Lady Godiva's, Inc. / BMI Music License**

Dear Mr. London,

This letter is in response to your correspondence dated September 24, 2010 and addressed to Mark Glessner of BMI and your subsequent conversation with Paul Knipler, Senior Director, BMI. Mr. Knipler has informed me that you continue to contend that Lady Godiva's, Inc. ("Lady Godiva's") is not an adult entertainment establishment. After review of all of the pertinent information gathered by BMI, it is difficult to understand your position. Lady Godiva's is clearly an adult club, and it does not qualify to be licensed under the Eating and Drinking Establishments Music License. BMI has attempted on numerous occasions to license your business on the proper music license.

As Mr. Glessner explained to you, BMI is obligated to offer the same music license to all business establishments in the same class and category. Lady Godiva's meets the specific definition of an Adult Entertainment Establishment in the Adult Entertainment Establishment Music License, as "an establishment that provides adult entertainment such as, but not limited to, striptease, erotic, nude or semi-nude performances, and includes, but is not limited to, burlesque houses, gentlemen's clubs, strip clubs, go-go bars and similar establishments."

According to Mr. Knipler, you stated that at least one court has found that you may no longer be involved in the adult entertainment business. If this is accurate, please forward to BMI a copy of such court order that outlines the restrictions which have been set so that we may further discuss how to proceed with licensing your establishment.

As a reminder, until such time as you execute the BMI Adult Entertainment Establishments Music License, your facility is not authorized by BMI to publicly perform any of the over 6.5 million works in the BMI repertoire, and the facility is to CEASE any unauthorized performance of BMI affiliated music. The unauthorized public



10 Music Square East, Nashville, TN 37203-4399  (615) 401-2882  Fax: (615) 401-2631  E-Mail: jburrow@bmi.com
® A Registered Trademark of Broadcast Music, Inc.

performance of copyrighted works constitutes copyright infringement in violation of United States Copyright Law and may subject the infringer to substantial monetary damages.

Very truly yours,

Jeffrey J. Burrow

Cc: Paul Knipler, Senior Director, BMI

# EXHIBIT
# I
### Page 2 of 2

EXHIBIT

J

Page 1 of 4

# PFEIFFLE LAW OFFICE, P.C.

1147 Stonebrook Ct. NE • Grand Rapids, MI 49505 • (616) 633-8417

February 28, 2011

Jeffrey J. Burrow
Director, Legal & Business Affairs, General Licensing
BMI, Inc.
10 Music Square East
Nashville, TN 37203-4399

Dear Mr. Burrow:

Our law firm represents Mark London, Sensations, Inc., and Lady Godiva's, Inc., all of Grand Rapids, Michigan. Mr. London has shared with me the many pieces of correspondence that have been exchanged over the past few months/years. The purpose of this letter is to explain to you in greater detail Mr. London's position and attempts to explain to you once again why Mr. London cannot and will not sign your Adult Entertainment Establishments Music Performance Agreement.

In your January 24, 2011 letter you indicate that "Lady Godiva's is clearly an adult club." We 100% disagree with your position. On several occasions Mr. London has written to your organization explaining that, although he was once involved with adult entertainment, he is no longer so engaged. This fact has been recognized and substantiated by the City of Grand Rapids, the State of Michigan and even your sister organization, ASCAP. Additionally, I have enclosed an article written by Larry Kaplan, Executive Director of ACE California/Michigan. The purpose of this enclosed article is to show you that our position has been tested and the courts agree with Mr. London.

In the same January 24, 2011 letter you attempt to explain that "BMI is obligated to offer the same license to all business establishments in the same class and category." This is exactly the point that Mr. London has tried in vain to explain to anyone in your organization who would listen. When Mr. London exited the adult entertainment business in 2006, others moved in to fill the void. I have enclosed newspaper and magazine articles that clearly indicate the establishments (Sazerac Lounge and Wealthy Theatre) that now offer adult entertainment in Grand Rapids, Michigan. These are the business establishments to which you should be offering your adult entertainment license. Like many other nightclubs in the Grand Rapids area, Mr. London has employees, at times, in bikini attire. However, to the best of our knowledge, this has not brought a demand from your organization that these establishments (such as, Crush Lounge at The B.O.B and TAPS Sports Grill, to name a few) license as adult entertainment. The above-mentioned nightclubs, as well as those clubs operated by Mr. London, are by anyone's definition restaurant/nightclubs. Therefore, we believe the appropriate license for Mr. London's

establishments would fall under your "restaurant/nightclub" license referred to on your website under Eating and Drinking Establishments Music Licenses.

Mr. London is firm in his position not to sign your Adult Entertainment License. Additionally, he could be subject to serious legal consequences for signing and agreeing to the fact that these nightclubs are something that they, in fact, are not. Furthermore, Mr. London, a former police officer and college criminal justice professor, believes that signing up for your Adult Entertainment License would constitute an act of fraud on his behalf. I believe the problem lies in your definition of adult entertainment in that your definition is vague and overbroad. Your language, "not limited to," in your definition may, in your opinion, include Mr. London's businesses, however, it would then include all liquor licensed establishments in the State of Michigan as well. Mr. London's businesses are no more adult than a public beach.

On behalf of Mark London, Sensations, Inc. and Lady Godiva's, Inc., we are once again asking you for a music license that is fair and equitable. It will remain our position that appropriate license would be an "Eating and Drinking Establishments Music License." If you offer some type of license (other than Adult Entertainment) that you feel is more appropriate, we would certainly be willing to consider such a license as an alternative.


Sincerely,



Alexander B. Pfeiffle, Esq.
Pfeiffle Law Office, P.C.

**EXHIBIT**

**J**

**Page 2 of 4**

by Larry Kaplan

# When is an adult nightclub not an adult nightclub?

**The Show at Papa Joe's features pole dancing and lap dancing, but the dancers are not topless or nude. So is it an adult business, subject to laws governing adult businesses? "No," says a jury in Los Angeles. Here, Larry Kaplan explains how attorney Roger Jon Diamond won a seemingly unwinnable case.**

A jury in Los Angeles has acquitted an adult nightclub operator in a criminal case for allegedly operating an adult business in the wrong zone, too close to a residential area and without an adult entertainment license.

The Los Angeles County Code allegedly was violated numerous times by John Lampasona, and in various ways. His club, The Show at Papa Joe's on East Colorado Boulevard, is located just east of the city of Pasadena, which means the Board of Supervisors of Los Angeles County has legislative jurisdiction over the area. Consequently, the county adopts zoning laws and licensing laws as it does for any spot in Los Angeles County that is not part of an incorporated city.

In late 2007, Lampasona and three partners found an existing restaurant that had a license to sell alcohol. The restaurant's previous operator was a corporation that already had entertainment licenses as well as licenses for public eating and for dance. However, the property could not be used for an adult business because it was zoned C-2, or local commercial, a designation that prohibits adult businesses. A separate code provision prohibits the operation of an adult business within 250 feet of a residence, and there was a residence immediately adjacent to the restaurant.

Accordingly, Lampasona and the other investors knew going in that they could not operate an adult business lawfully. Therefore, they reportedly did not even try to apply for an adult business license, but simply secured a general business license. However, upon opening, they immediately installed lap dancing in the VIP room.

The Show presented scantily-clad female dancers who "pole danced" in the main area and provided one-on-one dances in the semi-private VIP room. Most of the club's dancers never removed their tops, instead dancing in bikinis and see-through tops. They did, however, have close contact with the patrons. According to numerous undercover vice officers from the county sheriff's office, upon entering they would be greeted by dancers who solicited private dances in the VIP room.

Lampasona hired ACE attorney/advisor Roger Jon Diamond to represent him in this criminal case. Each day the business operated without the required adult entertainment permit, on property not zoned for adult use and too close to residential property, was considered a separate crime by the county. Each individual violation was punishable by six months in the county jail and $1,000 fine. Accordingly, Lampasona was facing many years in jail.

Diamond's defense was that the club was not an adult business as that term is defined by the county code. In the jury trial, the assistant Los Angeles District Attorney, Randal G. Harris, argued that Papa Joe's was obviously an adult business, claiming it was a matter of common sense. Diamond countered that common sense was irrelevant. The jury should examine the definition of an adult business in the code.

Diamond said that because The Show was not a topless club and not a nude club, the provision in the code relative to the exposure of anatomical areas of the body did not apply. Just because minors did not go to the club did not make it an adult business.

The district attorney maintained that the physical contact between bikini dancers and patrons made it an adult business. The trial judge agreed with Diamond's contention that the touching was irrelevant because the county, in a different part of the code (not the part dealing with the location and

continued from page 30

Most of the club's dancers never removed their tops, instead dancing in bikinis and see-through tops. They did, however, have close contact with the patrons.

licensing of adult businesses), prohibited physical contact between adult entertainers and patrons at adult businesses. Accordingly, Diamond reasoned, if The Show is not an adult business, the ban on touching did not apply.

California Superior Court Judge Dorothy L. Shubin agreed with Diamond that physical contact could not be used to decide whether it was an adult business. The judge instructed the jury that the determination as to whether it was an adult business had to be made without regard to the contact.

The district attorney conceded that the sexual activity portion of the adult business definition did not apply because there was no sexual activity. The DA seized upon the simulated sexual activity portion of the adult business definition, however, arguing that lap dancing simulated sexual activity and therefore meant the club was an adult business.

On this point, Diamond prevailed. He persuaded the trial judge to instruct the jury that to simulate means to create the appearance of certain conduct.

Diamond argued to the jury that no one at the club believed that dancers and patrons actually were engaged in sexual activity, and therefore there was no appearance of sexual activity. It was not "simulated" sex, but rather "pretend" sex.

The jury agreed, acquitting Lampasona of all counts. Diamond was even able to get back $600 in cash the undercover cops had seized at the raid. Since the judge determined the dances were legal, the money spent by the police to buy those dances was a fee paid for services and not money used to procure something illegal.

A guilty verdict would have meant the immediate closure of the Show at Papa Joe's, but the club never had to close. It remains open, and Lampasona is a free man. ◆

*This article first appeared in the ACE of California and ACE of Michigan newsletters. Larry Kaplan is Executive Director of both the ACE of California and ACE of Michigan adult nightclub state trade associations and a consultant to the adult nightclub industry. Contact Larry at (248) 487-0404 or e-mail larrykaplan@gmail.com. Roger Jon Diamond can be reached at (310) 399-3259.*



EXHIBIT J

Page 4 of 4